UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DARWIN NATIONAL ASSURANCE
COMPANY,

                Plaintiff and
                Counterclaim
                Defendant,

      - against -

WESTPORT INSURANCE CORPORATION
and THE INCORPORATED VILLAGE OF
OLD WESTBURY,

                Defendants and
                Counterclaim
                Plaintiffs.

-------------------------------------------------------
THE INCORPORATED VILLAGE OF OLD
WESTBURY,

                Third-Party
                Plaintiff,

      - against -

ST. PAUL GUARDIAN INSURANCE
COMPANY,

                Third Party
                Defendant.
-------------------------------------------------------X

**MEMORANDUM & OPINION**

Case No. 13–CV–02076 (PKC)

PAMELA K. CHEN, United States District Judge:

      In the present action, three insurers and their insured seek a determination as to which

entity (or entities) is responsible for defending the Village of Old Westbury ("the Village") in a

long-running dispute over the proposed development of a Roman Catholic cemetery ("the 2009

Queen of Peace Action" or "the 2009 Action").[1]  Five motions for summary judgment are currently pending before the Court.  Plaintiff and Counterclaim Defendant Darwin National Assurance ("Darwin") has moved for summary judgment against Westport Insurance Company ("Westport") and the Village, seeking a declaration that Darwin does not have the duty to defend the Village in the 2009 Queen of Peace Action, but that Westport does.  Westport, in turn, has moved for summary judgment against Darwin and the Village, seeking a declaration that Darwin has the duty to defend the Village, not Westport.  The Village has moved for summary judgment against both Darwin and Westport, seeking a declaration that both insurers must defend it.  The Village has also moved for summary judgment against a third insurer, St. Paul Guardian Insurance Company ("St. Paul"), seeking a declaration that St. Paul must defend the Village.  St. Paul has cross-moved against the Village, disclaiming that it has any duty to defend.

For the reasons set forth below, the Court GRANTS Darwin's motion and DENIES Westport's motion.  The Village's motion against Westport and Darwin is GRANTED IN PART (as to Westport) and DENIED IN PART (as to Darwin).  The Court GRANTS the Village's motion as to St. Paul and DENIES St. Paul's motion against the Village.

## I.    FACTUAL BACKGROUND

The following facts are taken from the parties' various 56.1 submissions.[2]  Because the dispute between the parties involves the interpretation of various insurance agreements and pleadings in the 2009 Queen of Peace Action, the material facts are not disputed.

---

[1]      The 2009 Queen of Peace Action is also before this Court.  *See The Roman Catholic Diocese of Rockville Centre, New York v. The Incorporated Village of Old Westbury*, Case No. 09–CV–5195 (E.D.N.Y.).

[2]      The parties have filed a number of 56.1 statements and responses for the Court's consideration.  Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citations to a party's 56.1

## A.    The Parties

The Incorporated Village of Old Westbury is an incorporated village under the laws of the State of New York, and is located in Nassau County, New York.  (Westport 56.1, ¶ 3).

Westport is an insurance company incorporated under the laws of the State of Missouri with its principal place of business in Overland Park, Kansas.  (Westport 56.1, ¶ 3).  Westport was known as Coregis Insurance Company when it issued its Policy to the Village during the policy period relevant to this action.  (Westport 56.1, ¶ 60).

Darwin is an insurance company incorporated under the laws of the State of Delaware with is principal place of business in Farmington, Connecticut.  (Westport 56.1, ¶ 2).

St. Paul is an insurance company incorporated under the laws of the State of Minnesota with its principal place of business in Hartford, Connecticut.[3]  (Dkt. 34, St. Paul Answer, ¶ 34).

---

Statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to underlying documents.

The 56.1 statements relevant to the action between Darwin, Westport and the Village are as follows: Dkt. 77–15, Village 56.1 Statement ("Village 56.1"); Dkt 51, Darwin 56.1 Statement ("Darwin 56.1"); and Dkt. 86–2, Westport 56.1 Statement ("Westport 56.1").  The Court notes that the parties also filed responses and counter-statements, but that the material facts were not disputed.

The 56.1 statements relevant to the third-party action between the Village and St. Paul are as follows:  Dkt. 59, St. Paul 56.1 Statement ("St. Paul 56.1"); Dkt. 85–2, Village Response to St. Paul 56.1 ("Westbury/St. Paul 56.1 Resp."); Dkt. 60–16 Village 56.1 Statement ("Westbury 56.1"); and Dkt 78, St. Paul Response to the Village 56.1 ("St. Paul/Westbury 56.1").

For citation purposes, the Court will refer to the Village as "Village" for papers filed in the Darwin/Westport/Village action.  The Court will refer to the Village as "Westbury" when citing to its papers filed in the Village/St. Paul action.

[3]       Though Darwin and St. Paul both have their principal places of business in Connecticut, they have not asserted claims against each other.  Therefore, the Court's diversity jurisdiction over the action remains intact.  *See Hallingby v. Hallingby*, 574 F.3d 51, 56 (2d Cir. 2009) (noting that to establish diversity jurisdiction under 28 U.S.C. § 1332(a)(1), "each plaintiff's citizenship must be different from the citizenship of each defendant.")

### B.     The Village's Insurance Policies

#### 1.     Westport Policy

Westport (formerly known as Coregis) issued a Public Officials and Employees Liability Insurance Policy No. 524-439024-3 ("the Westport Policy") to the Village for the period from June 6, 1995 to June 6, 1996.  (Westport 56.1, ¶ 60).  The Westport Policy is a "claims made" policy.  (Dkt. 77–13, Westport Policy at ECF 2, 5, 11). The Insuring Agreements section of the Westport Policy provides: "The Company will pay on behalf of the Insureds all Loss which the Insured shall be obligated to pay for any civil claim or claims for monetary relief made against them because of a Wrongful Act,[4] provided that the *claim is first made* during the policy period and written notice of the claim is received by the Company during the policy period."  (Dkt. 77–13, Westport Policy at ECF 11) (emphasis added).  The parties agree that the Village is the "Insured" under the policy.

Regarding Westport's duty to defend, the policy states that it "shall have the right and duty to select counsel and to defend any suits against the Insureds seeking damages for Loss, even if any of the allegations are groundless false or fraudulent. . . . [Westport] will pay, in addition to the applicable limit of liability, all fees charged by an attorney designated by the Company . . . resulting from the investigation, adjustment, defense and appeal of the claim, suit or proceeding."  (Dkt. 77–13, Westport Policy at ECF 11).  After Westport's liability has been exhausted by payment of judgment or settlements, Westport "shall not be obligated to pay any claim or judgment, or to defend any suit or pay any fees, costs or expense[.]"  (Dkt. 77–13, Westport Policy at ECF 11).

---

[4]     A "Wrongful Act" is defined as "any conduct by an Insured constituting actual or alleged error, misstatement, misleading statement, omission or breach of duty by the Insureds, committed solely within the scope of and/or while acting in their capacities as public officials of employees of the Public Entity."  (Dkt. 77–3, Westport Policy at ECF 11-12).

Condition 4.C of the Westport Policy provides that "[u]pon [Westport]'s receipt of the insured's written notice, any claim subsequently made against the Public Entity or the Insureds arising out of the Wrongful Act shall be treated as a claim made during the policy period in which such notice was given." (Dkt. 77–13, Westport Policy at ECF 13). The Westport Policy does not define the scope of a "claim."

The Village paid all premiums due under the Westport Policy. (Village 56.1, ¶ 3).

            2.    Darwin Policy

Darwin issued Public Officials Professional and Employment Practices Liability Insurance Policy No. 0202-1920 ("the Darwin Policy") to the Village for the Policy Period of March 5, 2009 to March 5, 2010. (Darwin 56.1, ¶ 62). Insuring Agreement A of the Darwin Policy states that Darwin "will pay on behalf of any **Insured**, subject to the Limit of Liability in ITEM 3(a) of the Declarations, **Loss** which the **Insured** is legally obligated to pay as a result of any **Claim** first made against any **Insured** during the Policy Period . . . for a **Public Officials** [*sic*] **Wrongful Act . . . ."** (Dkt. 52–16, Darwin Policy at ECF 4) (emphasis in original). Insuring Agreement A of the Darwin Policy also states that Darwin "will have the right and duty to defend any **Claim** first made against any **Insured** for a **Wrongful Act** which is covered under INSURING AGREEMENTS A. or B. of this Policy. (Dkt. 52–16, Darwin Policy at ECF 4) (emphasis in original). Like Westport's Policy, the Darwin Policy is a "claims made" policy. The Village is the Insured under the Darwin Policy.

*Claims Made and Notice.* The Darwin Policy states that "a **Claim**[5] will be deemed to have been first made when an **Insured** receives notice of the **Claim**." (Dkt. 52–16, Darwin

---

[5]      The Darwin Policy defines a claim as "(1) any written demand for monetary damages or Non-Monetary relief, . . . (3) any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding. . . ." (Dkt. 52–16, Darwin Policy at ECF 5).

Policy at ECF 5) (emphasis in original). It further provides that "[a]ll **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made." (*Id.* at ECF 17). A related claim is defined as "all **Claims** for **Wrongful Acts** based upon, arising out of, resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way." (*Id.* at ECF 9).

The Darwin Policy defines a wrongful act as a Public Official Wrongful Act, Employment Practices Wrongful Act, or Third Party Wrongful Act. (*Id.* at ECF 10). A Public Official Wrongful Act means (1) any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Personal Injury**, by any **Insured**; (2) any actual or alleged violation of civil rights protected under 42 U.S.C. § 1981 *et seq*., or any similar federal, state or local law, by any **Insured**; (3) any matter claimed against an **Insured** solely by reason of his or her status as an **Insured** during the **Policy Period**. (*Id.* at ECF 9).

*Prior or Pending Exclusion*. The Darwin Policy excludes certain events from coverage of defense expenses. The exclusion at issue here is Exclusion III.C.9 (the "Prior or Pending Exclusion"), which provides:

> The **Insurer** shall not pay any . . . **Defense Expenses** from any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: (9) any fact, circumstance, situation, transaction, event or **Wrongful Act** or series of facts, circumstances, situations, transaction, events or **Wrongful Acts**:
> > (a) underlying or alleged in any . . . litigation . . . brought prior to . . . the Inception Date [3/5/2009]:
> > > (i) to which any **Insured** is or was a party . . .
> > (b) which was the subject of any notice given prior to the Inception Date [3/5/2009] under any policy of insurance or plan or program of self-insurance; or
> > (c) which was the subject of any **Claim** made prior to the Inception Date [3/5/2009][.]

(*Id*. at ECF 11–12).  The Darwin Policy defines Defense Expenses as "reasonable legal fees and expenses incurred by or on behalf of the **Insured** in the defense or appeal of a **Claim**[.]"  (*Id*. at ECF 6).

*Other Insurance Provision.*  The Darwin Policy also has an "Other Insurance" provision which provides, in part, that "with respect to any **Claim** under this Policy for which coverage is available under any insurance policy which applies to claims for bodily injury and/or property damage, the **Insurer** will have no duty to defend such **Claim**, or to pay **Defense Expenses** incurred by or on behalf of any **Insured** in connection with such **Claim** or to contribute to any defense provided to any **Insured** under such other insurance policy, or to reimburse any other insurer, in whole or in part, for **Defense Expenses** incurred in connection with such claim."  (*Id*. at ECF 15).

The Village paid all premiums due under the Darwin Policy.  (Village 56.1, ¶ 18).

3.      St. Paul Policy

St. Paul issued an insurance policy to the Village, bearing policy number GP09314512 and effective from March 5, 2009 to March 5, 2010 (the "St. Paul Policy").  (Dkt. 61–1, St. Paul Policy at ECF 260).  The policy provided coverage for law enforcement liability and defense expenses for claims covered by the agreement.  (*Id*. at ECF 263).

The St. Paul Policy defined coverage as follows:

**What This Agreement Covers**

<u>**Law enforcement liability**</u>. We'll pay amounts any protected person is legally required to pay as damages for covered injury or damage that:

- results from law enforcement activities or operations by or for you;

- happens while this agreement is in effect; and

- is caused by a wrongful act that is committed while conducting law enforcement activities or operations.

(*Id*. at ECF 262) (emphasis in original). "Injury or damage" under the St. Paul Policy is defined to cover "bodily injury, personal injury, or property damage." (*Id*. at ECF 262). "Personal injury" is defined as "injury, other than bodily injury cause by any of the following wrongful acts: . . . wrongful entry or wrongful eviction[,] invasion of the right of private occupancy of a room, dwelling or premises that a person occupies[,] . . . violation of civil rights protected under any federal, state or local law." (*Id*. at ECF 262–63). "Law enforcement activities or operations" is defined to mean "any of the official activities of your police department, sheriff agency, or other public safety organization which enforces the law and protects persons or property." (*Id*. at ECF 263).

The Village paid all premiums due under the St. Paul Policy. (Westbury 56.1, ¶ 2).

### C.    Diocese's Earlier Actions Against the Village

The dispute in this action concerns the relationship, if any, between the 2009 Queen of Peace Action and earlier actions the Diocese filed against the Village. The Court briefly recounts the proceedings in the earlier actions here.

#### 1.    1996 Action

On May 10, 1996, the Roman Catholic Diocese of Rockville Center ("the Diocese") and Most Revered John R. McGann ("Bishop McGann") filed an eleven-count Verified Complaint against the Village, its Mayors, and its Trustees in the Supreme Court of New York, Nassau County. (Darwin 56.1, ¶ 8; Dkt. 52–4, Verified Complaint ("1996 Complaint")). The 1996 action arose out of the Diocese's purchase of 97 acres of property located in the Village and its plans to convert the property into a Roman Catholic cemetery. *See McGann v. Inc. Village of Old Westbury*, 741 N.Y.S.2d 75, 76 (N.Y. App. Div. 2002). At the time of the Diocese's purchase in 1995, the property was zoned for residential use , so the Diocese sought a zoning change that would permit the construction of a religious cemetery. *Id*.

The Diocese first made an application for a zoning change on October 5, 1993, before it had finalized its purchase of the property. (Darwin 56.1, ¶ 3). The Village informed the Diocese that an assessment under the New York State Environmental Quality Act ("SEQRA") was required, along with the payment of fees. (Darwin 56.1, ¶ 4). With the Village's determination of its application pending, the Diocese closed on the property on March 17, 1995. (Darwin 56.1, ¶ 5).

The Village held a public hearing on the proposed zoning change on November 30, 1995. (Darwin 56.1, ¶ 6). The Village denied the application on March 18, 1996. (Darwin 56.1, ¶ 7; *see also* Dkt. 52–3, Resolution Denying Application of the Diocese of Rockville Centre for Change of Zone ("1996 Village Denial")). Shortly thereafter, the Diocese filed the 1996 Action.

The 1996 Complaint alleged that the Village's application process and ultimate denial was "an elaborate charade specifically designed to delay and thwart the Diocese in its religious use of the [property]." (1996 Complaint, ¶ 26). It set forth eleven counts against the Village, including discriminatory zoning; violations of the Diocese's right to free exercise of religion and equal protection under the New York State Constitution; and violations of due process, equal protection, free exercise of religion, the federal Religious Freedom Restoration Act ("RFRA") and 42 U.S.C. § 1983. (*Id.* at ¶¶ 26–49).

The Village timely provided Westport with notice of the 1996 Action. (Village 56.1, ¶ 25). Westport provided a defense for the Village in the 1996 Action subject to a reservation of rights. (Westport 56.1, ¶ 66).

2.      1997 Action

On March 7, 1997, the Diocese and Bishop McGann filed an action against the Village, its Mayor and Trustees in the United States District Court for the Eastern District of New York, *McGann v. Simpson*, No. 97–CV–1339. (Dkt. 52–8, Complaint filed 3/7/1997 ("1997

Complaint")).  The 1997 Complaint alleged similar facts as those asserted in the 1996 Action, but added the Village's refusal to allow the Diocese to erect a tent on the property to permit an outdoor mass for All Souls Day, November 2, 1996.  (Darwin 56.1, ¶ 23).  The 1997 Complaint asserted four counts: (1) violation of RFRA by burdening the plaintiffs' free exercise of religion; (2) denial of equal protection under the federal and New York Constitutions; (3) exclusionary zoning not related to the health, safety or welfare of the community; and (4) violation of 42 U.S.C. § 1983 through the denial of the plaintiffs' application for a change of zone and rejection of the plaintiffs' request to conduct an outdoor mass on the property.  (1997 Complaint, ¶¶ 21-31).

The Village timely provided Westport with notice of the 1997 Action.  (Village 56.1, ¶ 30).  Westport provided a defense subject to a reservation of rights.  (Westport/Village 56.1, ¶ 31A).

The 1997 Action was stayed on the parties' consent, pending the final determination of the 1996 Action.   (Dkt. 52–9, Order of Administrative Closing, No. 97–CV–1339, filed 2/20/1998).

### 3.    State Court Proceedings in the 1996 Action

After a series of pre-trial motions, the 1996 Complaint was pared down to four causes of action: Count One (arbitrary and capricious denial of application), Count Six (deprivation of due process under the New York State Constitution), Count Nine (failure to accommodate religious use), and Count Eleven (violation of due process, equal protection, free exercise of religion, RFRA, and 42 U.S.C. § 1983).  (Dkt. 52–2, Order at 26, *McGann v. The Inc. Village of Old Westbury*, Index No. 10585/96 (N.Y. Sup. Ct. Nov. 9, 2000) ("2000 Order")).  Following a bench trial, the Supreme Court, Nassau County awarded judgment to the plaintiffs on Counts One, Six and Nine "to the extent that its proposed cemetery is found to constitute a religious

use." (2000 Order at 26). The court ordered the Village to issue the special permit that would allow the Diocese to build the cemetery. (*Id*. at 27).

The Village appealed the decision. The Appellate Division, Second Department affirmed the trial court's finding that the plaintiffs' proposed use of the property constituted a religious use. *McGann v. Inc. Village of Old Westbury*, 741 N.Y.S.2d 75, 76 (N.Y. App. Div. 2002). However, the Appellate Division determined that the trial court had erred in directing the Village to issue the special permit. *Id*. at 77. The Appellate Division remitted the proceeding to the Village to determine the environmental impact of the plaintiffs' proposed use under SEQRA. *Id*. The Order stated that "a determination on the plaintiffs' application shall be consistent with the preferential treatment afforded the religious use of [the] property." *Id*.

**D.      2009 Action Against the Village**

There is no dispute that, at the present date, the Queen of Peace property remains undeveloped. The Diocese alleges that its inability to build Queen of Peace is due to the Village's conduct to avoid the consequences of the State Court decisions in the 1996 Action. Accordingly, in 2009, it filed a new action in this Court, which is the subject of the insurers' present dispute over their duties to defend, if any. The Court recounts the proceedings and claims of the 2009 Action below.

1.      2009 Original Complaint

On November 30, 2009, with the Diocese's property in Westbury still undeveloped, the Diocese filed an action in the United States District Court, Eastern District of New York against the Village; its Board of Trustees; Mayor Fred Carillo, in his official capacity and individually; Trustees Harvey Blau, Steven Greenberg, Harvey Simpson and Michael Wolf, individually and in their official capacities; Michael Malatino, Superintendent of Buildings and Public Works;

and certain employees of the Village and its land use consultants. (*See* No. 09-cv-5195, Dkt. 1, Complaint filed 11/30/2009 ("2009 Compl.")).[6]

The 2009 Complaint described the proceedings in the 1996 action and alleged that the Village continued to deny the Diocese, its parishioners, and clergy the right "to practice, express and develop further their religious faith" through the construction of a cemetery on the Diocese's property." (2009 Compl., ¶ 3). The Diocese alleged that "[s]ince 1995, the Defendants . . . have prevented all religious development and use of the more than ninety-seven (97) vacant acres owned by the Diocese within the Village." (*Id*.).

The 2009 Complaint detailed the ways in which the Village allegedly stymied the Diocese's plans to develop the property, known as Queen of Peace. The Diocese recounted the history of its dispute with the Village, starting with its discussions in 1993 regarding the potential purchase of the property, the 1996 Action and subsequent disposition, and its post-Appellate Division decision efforts to develop Queen of Peace. The Diocese alleged that the Village took a number of actions over the fifteen-year period to improperly block its application, including the enactment in March 2001 of the Places of Worship Law, an amendment to the Village Code "which specifically and impermissibly targets religious institutions and restricts religious practice and in effect prohibits land use within the Village as a cemetery[.]" (2009 Compl., ¶ 74.A). The Diocese also alleged that the Village abused the SEQRA process by subjecting the Diocese to a number of demands designed to raise its expenditures and delay any action by the Village on the Diocese's application. (2009 Compl., ¶ 74.D). It further alleged that the Village's Superintendent of Buildings, Michael Malatino, conducted several warrantless searches of the

---

[6]    The 2009 Action was initially before District Judge Sandra J. Feuerstein. On July 26, 2010, it was reassigned to Senior District Judge Denis R. Hurley. The case was subsequently transferred to me on April 18, 2013.

property in April 2009, in order to "harass the Diocese in retaliation for continuing to insist that the long-abandoned structures on its Property had no historic value, and in an attempt to compel the Diocese to maintain them[.]" (2009 Compl., ¶ 74.H).

The 2009 Complaint set forth eight causes of action. Counts One and Four alleged violations of the Religious Land Use & Institutionalized Persons Protection Act ("RLUIPA") based on the Village's alleged arbitrary, capricious and unlawful imposition and implementation of its laws and land use regulations. (2009 Compl., ¶¶ 85–91, 107–11). Count Two, brought under 42 U.S.C. § 1983, alleged a violation of the Diocese's rights to free exercise of religion and equal protection through the Village's disparate treatment of the Diocese and its application. (*Id*. at ¶¶ 92–101). Count Three alleged that the Village deprived the Diocese of equal protection of the law through its alleged abuse of the SEQRA process. (*Id*. at ¶¶ 102–06). Count Five alleged that the Village's conduct was in direct retaliation of the 1996 Action. (*Id*. at ¶¶ 112–15). Count Six alleged that the Village deprived and continued to deprive the Diocese of the free exercise of religion through the passage of the Places of Worship Act, the Village's application of its land use ordinances, and the Village's application of SEQRA. (*Id*. at ¶¶ 116–21). Count Seven alleged a civil rights conspiracy under 42 U.S.C. § 1985. (*Id*. at ¶¶ 122–27). Finally, Count Eight alleged a violation of 42 U.S.C. § 1986 based on Defendants' knowledge that Diocese's proposed use was permitted and their failure to stop other Defendants from committing the wrongful acts alleged in the 2009 complaint. (*Id*. at ¶¶ 128–35).

2. The Village Notifies its Insurers of the 2009 Complaint

The Village made timely notice to Westport, Darwin and St. Paul of the 2009 Complaint. (Village 56.1, ¶¶ 53–54; Westbury 56.1, ¶ 33). Westport agreed to tender a defense for the 2009 Action subject to a reservation of its rights. (Village 56.1, ¶ 55). Darwin, however, initially declined to defend the Village; after negotiations with Westport, Darwin agreed to share the

Village's defense costs with Westport subject to a reservation of its rights. (Village 56.1, ¶ 56–57). St. Paul refused to provide a defense to the Village for the 2009 Action and has not contributed to the defense thus far. (Westbury 56.1, ¶ 34–35).

### 3. Motion to Dismiss and Order

The Village moved for dismissal of the 2009 Complaint.[7] *See The Roman Catholic Diocese of Rockville Ctr., New York v. Inc. Vill. of Old Westbury*, No. 09–CV–5195, 2011 WL 666252, at *1 (E.D.N.Y. Feb. 14, 2011). Of relevance to this action, the Village argued that the Diocese's claims pursuant to Sections 1983, 1985 and 1986 and RLUIPA were time-barred insofar as they relied on conduct occurring outside of the statutory limitations period. *Id*. at *11. The Diocese argued that its claims were not time-barred because the 2009 Complaint contained allegations of an "uninterrupted course of discriminatory conduct," thereby establishing a continuing violation of its rights. *Id*. at *13.

Applying the standard for a continuing violation,[8] Judge Hurley found that the Diocese's claims based on the Village's conduct prior to the commencement of the 1996 Action were time-

---

[7]     The Consultant Defendants named in the 2009 Complaint also moved for dismissal. Judge Hurley dismissed all claims asserted against them. *Roman Catholic Diocese*, 2011 WL 666252, at *22.

[8]     "Where a plaintiff can demonstrate an ongoing or continuing violation of his federally protected rights, 'the plaintiff is entitled to bring suit challenging all conduct that was a part of the violation, even conduct that occurred outside the limitations period.' '[C]ourts of this circuit consistently have looked unfavorably on continuing violation arguments . . . and have applied the theory only under compelling circumstances.' Compelling circumstances could include: '[W]here the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy [that is] alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.'" *Roman Catholic Diocese*, 2011 WL 666252, at *12 (citations omitted).

barred because "the Diocese knew (or had reason to know) of such claims as of 1996." *Id*. Therefore, the Diocese's claims regarding pre-1996 conduct accrued at that time. Judge Hurley also found that the Diocese's claims based on any wrongful acts by the Village in litigating the 1996 Action also accrued during the litigation, or, at the very latest, by September 2002 when the 1996 Action concluded. *Id*. However, Judge Hurley found that the Diocese's claims regarding the Places of Worship Law sufficiently alleged a continuing violation of the Diocese's rights, as the Diocese had alleged that the law was constitutionally invalid, thereby constituting "the equivalent of a continuing invasion of plaintiffs' property rights akin to a continuing trespass[.]" *Id*. at *14 (citing cases). Therefore, the Village's motion to dismiss was denied as to claims based on the Places of Worship Law.

Judge Hurley also dismissed the Diocese's equal protection claims based on the abuse of the SEQRA process, finding them unripe for review. *Id*. at *15 (finding the Village's failure to issue a final decision on the Diocese's application for a special permit rendered such claims unripe for review). In addition, Judge Hurley dismissed the Diocese's First Amendment and RLUIPA claims based on abuses of the SEQRA process as unripe. *Id*. at *19.[9]

Following Judge Hurley's Order, the Diocese moved to amend the complaint. Judge Hurley granted Plaintiff's motion to amend the pleading in part and granted it in part. (*See* Dkt. No. 76, Order dated 4/23/2012).

---

[9] Eight months after the Diocese initiated the 2009 Action, the Village passed a resolution that purported to grant the Diocese certain permits and variances related to Queen of Peace. *Roman Catholic Diocese*, 2011 WL 666252, at *19. At the time of the Village's motion to dismiss, the Diocese contended that the resolution did not materially alter the status quo between the parties. *Id*. Judge Hurley found that the adoption of the resolution did not render the Diocese's claims ripe, in part because the Diocese had not amended its complaint to include the resolution. *Id*. at *20.

4. Amended Complaint

On May 7, 2012, the Diocese filed an Amended & Supplemental Complaint against the Village; the Board of Trustees; Mayor Fred Carillo; Trustees Harvey Blau, Steven Greenberg, Harvey Simpson and Michael Wolf; and Village Buildings Superintendent Michael Malatino. (*See* No. 09-cv-5195, Dkt. 77, Amended Complaint filed 5/7/2012 ("2009 Am. Compl.").[10] The Amended Complaint recounted the history of proceedings on Queen of Peace (*id.* at ¶¶ 1–70), expanded its discussion of the passage of the Places of Worship Law (*id.* at ¶¶ 71–82), and further detailed its allegations regarding the Village's abuse of the SEQRA process (*id.* at ¶¶ 83–115). It also retained its allegations regarding the warrantless searches of the property. (*Id.* at ¶¶ 100–02).

In addition to recounting the Diocese's history of dealings with the Village, as it had in the original complaint, the Amended Complaint included additional acts that the Village had committed during the pendency of the 2009 Action. The Diocese alleged that the Village had improperly adopted its own Final Environmental Impact Study on December 21, 2009, rather than acting on the Final Environmental Impact Study submitted by the Diocese. (2009 Am. Compl., ¶¶ 111–15). The Diocese also alleged that the Village's June 2010 adoption of a Resolution purporting to grant a special permit to the Diocese did no such thing; the Diocese alleged that the Resolution, "the last and final step in the review of the Diocese's application to develop Queen of Peace," imposed onerous and restrictive conditions that substantially burdened religious use. (*Id.* at ¶¶ 116–122).

---

[10] The 2009 Complaint no longer moved against the Village Planner or the Village's consultants.

The Amended Complaint sets forth six claims.[11] Counts One and Four allege violations of the RLUIPA. Count One alleges that the Village violated RLUIPA by imposing and implementing land use regulations "with respect to the Diocese and its application to develop Queen of Peace in a manner that imposes a substantial burden" on the Diocese's religious exercise. (*Id*. at ¶ 137). Count One also alleges that the Village discriminated against the Diocese and subjected it to disparate treatment. (*Id*. at ¶¶ 140–41). Count Four also alleges a RLUIPA violation through the Village's "arbitrary, capricious and unlawful imposition and implementation of the laws that treated the Diocese . . . on less than equal terms than a nonreligious assembly or institution." (*Id*. at ¶¶ 157–61).

Counts Two, Three, and Six set forth the Village's constitutional claims. Count Two alleges the Village deprived the Diocese of its First and Fourteenth Amendment rights to equal protection of the law on account of religion. (*Id.* at ¶¶ 142–51). The Diocese pointed to the Village's enactment of the Places of Worship Law "as further evidence of each and all of the Defendants' improper and unconstitutional animus"). Count Three alleges a deprivation of the Diocese's right to equal protection based on the Village's discriminatory treatment of the Diocese in adjudicating its application and conducting a SEQRA review. (*Id.* at ¶¶ 152–56). Count Six alleges that the Village deprived and continues to deprive the Diocese of its right to free exercise of religion. (*Id.* at ¶¶ 166–71). The Diocese alleges that the Village's implementation of the Places of Worship Law unconstitutionally interferes with the Diocese's free exercise of religion and that the Village singled out the Diocese for unequal, adverse treatment. (*Id*. at ¶¶ 169–70).

---

[11] The Amended Complaint did not include the 2009 Complaint's counts pled under 42 U.S.C. § 1985 and § 1986.

Count Five alleges a First Amendment retaliation claim. The Diocese alleges that the Village's conduct "from in or about 2003 through the present was in direct retaliation" for the 1996 Action. (*Id.* at ¶¶ 162–65). The Diocese also alleges that the Village and the other named Defendants acted in concert with each other, under color of law and in their respective official positions, in furtherance of a custom or policy, to deprive the Diocese, its parishioners, and its clergy of its rights under the First and Fourteenth Amendments. (*Id.* at ¶¶ 165).

The Amended Complaint remains the operative complaint in the 2009 Queen of Peace Action. The parties' cross-motions for summary judgment were argued before this Court on January 29, 2015, and a decision is pending.

### E.      The Instant Action

On April 9, 2013, Darwin filed the instant action against the Village and Westport, seeking a declaration that it did not have a duty to defend the Village in the 2009 Action. (Dkt. 1, Darwin Compl.). In the alternative, it sought a declaration that it would have to pay no more than one-third of the defense costs and expenses in the 2009 Action, with Westport obligated to pay the remainder. (Darwin Compl. at ECF 13–14). The Village answered, and brought a third-party complaint against St. Paul, a cross-claim against Westport, and a counterclaim against Darwin. (Dkt. 6). Westport answered the relevant pleadings and asserted a counterclaim against Darwin. (Dkt. 8). St. Paul answered the Village's third-party complaint and did not assert any claims against Darwin or Westport. (Dkt. 17).

Darwin filed an Amended Complaint against the Village and Westport on October 16, 2013, (Dkt. 22 ("the Darwin Complaint"), which the Village and Westport both answered (Dkt. 29, 30). On November 17, 2013, this Court granted leave to the parties to file cross-motions for summary judgment. The parties filed their motions on June 27, 2014.

18

## II.    DISCUSSION

### A.    Standard of Review

#### 1.    Summary Judgment Standard

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.)*, 153 F.3d 61, 67 (2d Cir. 1998) (citing Fed. R. Civ. P. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee*, 109 F.3d at 134. Where the parties have cross-moved for summary judgment, as here, the Court construes the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all reasonable inferences against the respective movant. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009).

The dispute presented here is the proper construction of the Village's insurances policies with Darwin, Westport and St. Paul. "Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Nomura Holding Am., Inc. v. Fed. Ins. Co.*, No. 13–CV–5913, 2014 U.S. Dist. LEXIS 127574, at *18 (S.D.N.Y. Sept. 11, 2014) (citations omitted). In New York, the determination of whether a contract is unambiguous and if so, how its terms should be construed, presents a legal question for the Court. *Seiden*

*Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992). The Court may grant summary judgment when the contract "convey[s] a definite and precise meaning absent any ambiguity." *Id.* at 428. Where the language of the contract unambiguously conveys the parties' intent, the Court does not consider extrinsic evidence. *Id.*

If the contract's terms are ambiguous, meaning that they are susceptible to more than one reasonable interpretation, the Court may receive extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract. *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275–76 (2d Cir. 2000). If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court "may apply other rules of contract construction, including the rule of *contra proferentem*, which generally provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'" *Id.* (quoting *McCostis v. Home Ins. Co.*, 31 F.3d 110, 113 (2d Cir. 1994)).

### 2.  Insurer's Duty To Defend

The parties agree that New York law governs their dispute. In New York, an insurer's duty to defend is broad. *See Allianz Ins. Co v. Lerner*, 416 F.3d 109, 115 (2d Cir. 2005). An insurer's obligation to defend is triggered whenever there is a reasonable possibility that the allegations will lead to coverage. *Silverman Neu, LLP v. Admiral Ins. Co.*, 933 F. Supp. 2d 463, 471 (E.D.N.Y. 2013). "A defense obligation can be avoided only where there is 'no possible factual or legal basis' on which an insurer's duty to indemnify under any provision of the policy could be held to attach[.]" *Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 83 (2d Cir. 2006) (citing *Servidone Constr. Corp. v. Security Ins. Co. of Hartford,* 64 N.Y.2d 419, 424 (N.Y. 1985)).

To determine whether an insurer has a duty to defend requires a comparison of the allegations of the complaint to the terms of the policy. *Century 21, Inc.*, 442 F.3d at 83 (citing *A.*

*Meyers & Sons Corp. v. Zurich Am. Ins. Group,* 74 N.Y.2d 298, 302, (N.Y. 1989). "If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Century 21, Inc.*, 442 F.3d at 83 (quoting *Colon v. Aetna Life & Cas. Inc. Co.,* 66 N.Y.2d 6, 8–9 (N.Y. 1985)). The insurer seeking to be relieved from the duty to defend bears the "heavy burden of establishing that (i) the allegations in the complaint are solely within the exclusion, (ii) the exclusion is subject to no other reasonable interpretation, and (iii) there is no basis upon which the insurer will ultimately be held obligated to indemnify the insured." *Sils Brokerage Corp. v. U.S. Underwriters Ins. Co.*, No. 10-CV-5176, 2014 WL 1276586, at *4 (E.D.N.Y. Mar. 27, 2014) (citing *Silverman*, 2013 WL 1248629, at *7).

**B.      Darwin Does Not Have A Duty To Defend The Village In The 2009 Action**

Darwin argues that it does not have a duty to defend the Village because (1) the 2009 Action is not a claim "first made" during the Darwin Policy's Policy Period; (2) the Darwin's Policy's prior or pending litigation exclusion excludes the 2009 Action from coverage; and (3) the Darwin Policy's "other insurance" provision requires the Village to seek coverage from St. Paul. Because the Court finds that Darwin does not have a duty to defend based on the Darwin Policy's provisions regarding claims "first made" and prior or pending litigation, the Court does not reach Darwin's argument regarding the "other insurance" provision.[12]

Darwin argues that, under the terms of the Village's policy, the 2009 Action is not a claim "first made" during the Darwin Policy's Policy Period of March 5, 2009 through March 5, 2010. (Darwin Memo at ECF 24–25). The Darwin Policy provides coverage only for Claims "first made" during the Policy Period. (Dkt. 52–16, Darwin Policy at ECF 4). However, all

---

[12]      Because Darwin has not formally asserted a claim against St. Paul, the Court questions the procedural propriety of Darwin's argument as to the St. Paul Policy.

related claims are "treated as a single claim when the earliest of such related claims was first made." (*Id*.). Darwin contends that the 2009 Action constitutes a "related claim" to the 1996 and 1997 actions, rendering it a claim that was not first made during Darwin'sPolicy Period. (Darwin Memo at ECF 24–25).

To determine whether the 2009 Action is not a claim "first made" during the applicable Policy Period, the Court must first construe the Darwin Policy's definition of a "claim." Darwin seems to assert that the 2009 Action is the relevant "claim," while the Village argues that construing "claim" to refer to the entire 2009 Action is too broad. (Village Opp. at ECF 12). Admittedly, the Darwin Policy's definition of a claim encompasses both a "written demand for monetary damages or non-monetary relief" and "any civil proceeding . . . commenced by the filing of a complaint," (Dkt. 52–16, Darwin Policy at ECF 5). The Village, however, points to recent New York precedent finding that construing "claim" to mean a lawsuit, rather than a cause of action, was too broad. *See Westpoint Int'l, Inc. v. Am. Int'l S. Ins. Co.*, 899 N.Y.S.2d 8, 9 (N.Y. App. Div. 2010). The Village exhorts the Court to analyze each cause of action separately, as the Appellate Division did in *Westpoint International.* The Court agrees that, based on the reasoning of *Westpoint International,* it is appropriate to construe "claim" as a cause of action, rather than the entire lawsuit, and will examine each of the Amended Complaint's causes of action separately.

Next, the Court must determine whether the causes of action in the Amended Complaint are "related" to those asserted in the 1996 and 1997 Actions, based on the Darwin Policy's definition of a "related claim." The Darwin Policy contains a comprehensive definition of "related claims": "all Claims for Wrongful Acts *based upon, arising out of, resulting from, or in any way involving* the same or related facts, circumstances, situations, transactions or events or

*the same or related series* of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way." (Dkt. 52–16, Darwin Policy at ECF 9) (emphasis added).

*Based upon, arising out of, in any way involving.* Courts interpreting insurance policies governed by New York law have given broad construction to the terms "based upon," "arising out of," and "in any way involving." *See Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 351 (N.Y. 1996) ("'based on' and 'arising out of,' when used in insurance policy exclusion clauses, are unambiguous and legally indistinguishable"); *Denihan Ownership Co., LLC v. Commerce & Indus. Ins. Co.*, 37 A.D.3d 314, 315 (N.Y. App. Div. 2007) (finding "based on" and "arising out of" have a "broad and comprehensive meaning"); *see also Quanta Lines Ins. Co. v. Investors Capital Corp.*, No. 06–CV–4624, 2009 WL 4884096, at *21 (S.D.N.Y. Dec. 17, 2009), *aff'd sub nom.*, *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, 403 F. App'x 530 (2d Cir. 2010) (rejecting argument that the breadth of "in any way involving" rendered a litigation exclusion clause illusory). While "based upon" and "arising out of" imply a causal relationship, "in any way involving" does not require one. *Id.* at *21 (finding that while "aris[e] out of" indicates some causal connection, "in any way involve[s]" does not). Courts have regularly found these terms to have unambiguous meanings. *See Nomura Holding*, 2014 U.S. Dist. LEXIS 127574, at *31-32 (finding related claims provision in claims made policy unambiguous where related claims were defined as "all Claims for Wrongful Acts based upon, arising from . . . the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events."); *Pereira v. Nat'l Union Fire Ins. Co.*, 525 F. Supp. 2d 370, 376–77 (S.D.N.Y. 2007) (finding that "based

on, arising out of . . . or in any way involving" unambiguously describes several types of various possible relationships between the claims alleged and the underlying facts).

The Court thus finds that "arising out of" and "based upon" unambiguously require a causal relationship between the claims in the Amended Complaint and the wrongful acts alleged in the 1996 Action, while "in any way involving" simply requires some kind of connection or relationship between the two.

*The same or related facts.* To determine whether a claim is the same as or related to a prior claim for purposes of a "claims made" policy, courts interpreting New York law have sought to determine whether the claims at issue share a "sufficient factual nexus." *See Nomura*, 2014 U.S. Dist. LEXIS 127574 at *38 (citing *Quanta Lines*); *Quanta Lines*, 2009 WL 4884096 at * 14 (citing cases). "A sufficient factual nexus exists where the claims 'are neither factually nor legally distinct, but instead arise from common facts' and where the 'logically connected facts and circumstances demonstrate a factual nexus' among the Claims." *Id.* (citing *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02–CV–10088, 2004 WL 1145830, at *9 (S.D.N.Y. May 21, 2004), *aff'd,* 133 F. App'x 770 (2d Cir. 2005)).

Applying the sufficient factual nexus test and the Court's construction of the "claims made" provision, it is clear that the causes of action asserted in the Amended Complaint "aris[e] out of, result[]from, or in any way involv[e] the same or related facts, circumstances, situations, transactions or events" as those alleged in the 1996 Action. As Darwin notes, the two complaints involve the same property (Queen of Peace), the same types of complaints (violation of rights to free exercise and equal protection; discriminatory zoning; disparate treatment), and virtually the

same parties.[13]  As such, they share a "sufficient factual nexus" to be considered the "same or related facts, circumstances, situations, transactions or events."

It is also clear that the Amended Complaint sets forth causes of action that "arise out of" or "in any way involve" those asserted in the 1996 Action.  The Amended Complaint alleges a fifteen-year campaign on the part of the Village to stymie the development of Queen of Peace and a consistent course of discriminatory conduct against the Diocese.  (*See, e.g.*, Am. Compl., ¶ 1 ("Due to the anti-religious act and failures to act of the government defendants named in this action for more than fifteen (15) years, . . ."); *id.* at ¶ 124 ("The Diocese has not moved a meaningful shovel on its Property . . . in the more than fifteen (15) years since March 1996, when the Village and its Board initially blocked improperly its application.")).  It also alleges the Village's longstanding discriminatory animus against the Diocese, which not only led to the Village's blocking of the initial application in the 1996 action, but resulted in the enactment of the Places of Worship Law "in a direct attempt to avoid the consequences" of the State Court

---

[13]      The Village argues that the Amended Complaint names defendants not part of the 1996 and 1997 actions.  (Village Memo at ECF 20).  But the fact that the Amended Complaint asserts causes of action against individual defendants not named in the 1996 Action is immaterial, because all of the individual defendants named in the 2009 Action are agents of the Village, and the Diocese alleges that these individual defendants played a role in carrying out the Village's alleged discriminatory scheme.  (Darwin Opp. at ECF 13).  Thus, the facts remain "the same or related."  *See Zunenshine v. Executive Risk Indem., Inc.*, No. 98-9251, 1999 U.S. App. LEXIS 14629, at *4 (2d Cir. Jun. 29, 1999) ("it is immaterial that the two lawsuits involved different parties and somewhat different legal harms (negligent misrepresentation vs. securities fraud), because the [relevant] policy terms clearly focus on the existence of common *facts*.") (emphasis in original); *see also Seneca Ins. Co.*, 2004 WL 1145830, at *7 ("the court evaluates an exclusion based on the underlying facts rather than the legal theories pleaded or additional defendants named.").

decisions in the 1996 Action. (*Id.* at ¶ 71). Thus, the Diocese alleges that the Village's actions challenged in the 2009 Action "arose out of" the Village's prior conduct.

Specifically, the Diocese's RLUIPA claims (Counts One and Four) are premised on allegations that the Village's "arbitrary, capricious, and unlawful imposition and implementation" of its laws and land use regulations burden the Diocese's exercise of religion without furthering a compelling government interest. Though these causes of action are based on allegations of the Village's alleged abuse of the SEQRA process after 2002, passage of the Places of Worship Law in 2001, and adoption of a burdensome Resolution in 2010, the Amended Complaint alleges that the Village took such actions as part of a long-standing campaign, dating back to the 1996 Action, to block the development of Queen of Peace. (*See, e.g.*, Am. Compl., ¶ 79 ("The Defendants . . . intentionally co-opted and tricked the Diocese and its representatives from 1993 forward to keep the Diocese from the full religious use at Queen of Peace . . . The POW Law is one of the more glaring examples of this strategy."); *id.* at ¶¶ 116-18 (asserting that the Village's adoption of the Resolution was the "last and final step" of the zoning dispute that was the subject of the 1996 Action)). The Amended Complaint's RLUIPA claims thus "arise out of" or "in any way involve" the "same or related facts" asserted in the 1996 Action.[14]

So too with the Amended Complaint's constitutional claims (Counts Two, Three and Six), which are premised on allegations that the Village has long harbored discriminatory animus

---

[14]    The Village argues that the Diocese asserts claims under RLUIPA that it could not have brought in the 1996 Action, because the RLUIPA was not passed until 2000. (Village Memo at ECF 21). But the test is not whether the Diocese could have brought the exact same claims under the exact same legal theories. Thus, this argument is irrelevant to the Court's determination that Darwin does not have a duty to defend. *See Seneca Ins. Co.*, 2004 WL 1145830, at *7 ("the court evaluates an exclusion based on the underlying facts rather than the legal theories pleaded").

against the Diocese and has acted to deprive the Diocese of free exercise of religion and equal protection of the law. These counts all relate back to the Diocese's application to develop Queen of Peace, which was the subject of the 1996 Action. (*See, e.g.*, Am. Compl., ¶ 149 (alleging that the enactment of the Places of Worship of Law, "in response to the Diocese's application to develop Queen of Peace," is evidence of the Village's "improper and unconstitutional animus"); *id.* at ¶¶ 152-56 (referring to the Diocese's application to develop Queen of Peace, which was the subject of the 1996 Action); *id.* at ¶¶ 168-71 (alleging a deprivation of free exercise through the implementation of the Places of Worship Law and application of SEQRA and land use ordinances)).

Count Five of the Amended Complaint alleges retaliation against the Diocese for its initiation of the 1996 Action, which arose out of the Village's rejection of the Diocese's application to develop Queen of Peace. (*Id.* at ¶¶ 162-65). Because the very nature of a retaliation claim implies a causal connection between earlier events and the alleged retaliator's response, this Count clearly "arises out of" the same or related facts asserted in the 1996 Action.

In an attempt to find a duty to defend, the Village argues that Darwin's duty is triggered by the Amended Complaint's allegation that the individual defendants' actions "have also been motivated by separate and personal goals divergent from those of the Village, including the desire for reelection and the associated benefits of office." (Am. Compl., ¶ 129; Village Memo at ECF 20–21). The Court finds this argument unavailing. The plain terms of the allegation include "also," which implies that any personal motivations harbored by the individual defendants were *in addition to* the Village's alleged animus against the Diocese. Thus, this allegation still "involv[es]" the "same or related" facts as those asserted in the 1996 Action. The

Village's interpretation reads "also" out of the Amended Complaint's allegation and therefore cannot prevail.

Having found that the claims "first made" provision absolves Darwin of the duty to defend the 2009 Action, the Court likewise finds that the "prior or pending litigation" also relieves Darwin of the duty to defend. The "prior or pending litigation" uses similar terms as the claims "first made" provision:

> The **Insurer** shall not pay any . . . **Defense Expenses** from any **Claim** *based on, arising out of*, directly or indirectly resulting from, in consequence of, *or in any way involving*:
>
> (9) *any* fact, circumstance, situation, transaction, event or **Wrongful Act** or series of facts, circumstances, situations, transaction, events or **Wrongful Acts**:
>
>> (a) underlying or alleged in any . . . litigation . . . brought prior to . . . the Inception Date [3/5/2009]:
>>
>>> (i) to which any **Insured** is or was a party . . .
>>
>> (b) which was the subject of any notice given prior to the Inception Date [3/5/2009] under any policy of insurance or plan or program of self-insurance; or
>>
>> (c) which was the subject of any **Claim** made prior to the Inception Date [3/5/2009][.]

(Dkt. 52–16, Darwin Policy at ECF 11–12) (emphasis in original and added). As determined above, by alleging that the Village's actions stem from its animus against the Diocese and its campaign to block the Diocese's application to develop Queen of Peace, the Amended Complaint alleges causes of action that "arise out of" or "in any way involve" facts "underlying or alleged" in the 1996 Action to which the Village was a party and which were the subject of the Village's notice to Westport regarding the Diocese's 1996 suit. Therefore, the "prior or pending litigation" exclusion also relieves Darwin of its duty to defend the Village in the 2009 Action. *See Zunenshine*, 1998 WL 483475 (finding policy's prior or pending litigation exclusion

absolved defendant of the duty to defend, where the provision precluded defense expenses "for Claims based upon, arising out of, . . . or in any way involving: any fact, . . . or Wrongful Act underlying or alleged in any prior and/or pending litigation . . . as of [the Inception Date]").

The Court thus grants Darwin's motion for summary judgment and denies the Village's and Westport's motions for summary judgment with respect to the Darwin Complaint.

### C.      Westport Has a Duty To Defend The Village in the 2009 Action

Westport argues that it does not have a duty to defend the Village based on Condition 4.C of the Westport Policy.  Condition 4.C of the Westport Policy provides that "[u]pon [Westport]'s receipt of the insured's written notice, any claim *subsequently made* against the Public Entity of the Insureds *arising out of* the Wrongful Act shall be treated as a claim made during the policy period in which such notice was given.  (Dkt. 77–13, Westport Policy at ECF 13) (emphasis added).  Westport contends that the claims in the 2009 Amended Complaint do not arise out of the Village's wrongful acts in the 1996 Action because (1) the 2009 Amended Complaint asserts new conduct by the Village that occurred after the conclusion of the 1996 Action, and (2) the Court's prior Order, in the 2009 Action, on the Village's motion to dismiss, rejected the Diocese's theory that violations from the 1996 Action continued to the 2009 Action, thereby requiring this Court to now find that the Amended Complaint's claims do not "arise out of" the allegations in the 1996 Action.

Westport also argues that the Amended Complaint's claims do not fall within the ambit of Condition 4.C.  Westport points out that Condition 4.C lacks a "related claims" provision (as the Darwin Policy had).  (Westport Reply at ECF 5).  Thus, in Westport's view, "Condition 4.C would only apply to the [Amended Complaint] if the claims asserted therein were based on the **same** Wrongful Acts as those alleged in the prior notice that Westport received during its policy

term—to wit, the same Wrongful Acts as those on which the claims asserted in the 1996 Action were based." (*Id*. at ECF 4) (emphasis in original).

Westport thus concedes that a duty to defend may attach if claims asserted in the 2009 Amended Complaint are "based upon" or "arise out of" the allegations of the Village's misconduct in the 1996 Action. In light of the broad duty to defend that applies to insurers in New York, *Century 21*, 442 F.3d at 83, the only way that Westport may prevail is to show that *none* of the claims asserted in the 2009 Amended Complaint "arise out of" the 1996 Action. *See Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (N.Y. 1997) ("If any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action.") This it cannot do.

In analyzing whether Darwin had a duty to defend the Village, the Court has found that all counts of the Amended Complaint "arise out of" or "in any way involve" "the same or related facts" as those asserted in the 1996 Action. *See* Section II.B, *supra*. Because Condition 4.C of the Westport Policy does not have a related claims provision, the Court must inquire as to whether any counts of the Amended Complaint "arise out of" "the same" facts as those asserted in the 1996 Action. Thus, to find a duty to defend, the Court must find a causal connection between the claims in the Amended Complaint and the facts asserted in the 1996 Action.[15]

The Court finds that the Diocese's claims based on the Village's enactment of the Places of Worship Law suffice to establish Westport's duty to defend. Count Two of the Amended

---

[15]    The Village urges the Court to apply the "sufficient factual nexus" text to determine whether the Amended Complaint's claims arise out of the allegations in the 1996 Action. (Village Opp. at ECF 18). Westport argues, however, that the "sufficient factual nexus" test is only applicable to policies containing "related claims" provisions. (Westport Reply at ECF 5–7). Because the Amended Complaint's claims are clearly covered by Condition 4.C of the Westport Policy, the Court declines to rule on whether the "sufficient factual nexus" test may be applied to insurance policies lacking a "related claims" provision. *See The Roman Catholic Diocese*, 2011 WL 666252, at *13.

Complaint alleges that the Places of Worship Law was adopted "*in response to* the Diocese's application to develop Queen of Peace," thereby alleging a causal connection between the Diocese's application and the enactment of the law. (*See* Am. Compl., ¶ 149; *see also id*. at ¶ 71 (alleging that the Places of Worship Law was enacted three months after the trial court determined that the Diocese's application constituted a religious use of the property)). The Diocese's application to develop Queen of Peace and the Village's 1996 denial of the application were the basis of the 1996 Action. (*See* 1996 Complaint, ¶ 25 (detailing the Board's denial of the Diocese's application)). Thus, by virtue of its reliance on the Places of Worship Law and its enactment in response to the Diocese's application, Count Two of the Amended Complaint "arises out of" the same facts as those alleged in the 1996 Action, thereby satisfying Condition 4.C of the Westport Policy.[16]

Westport further argues that Judge Hurley's earlier Order in this action, dismissing certain claims as time-barred, severs any connection that the Amended Complaint might have to the 1996 Action. Westport's theory is that because the Order determined that certain claims based on the Village's conduct before 2002 were time-barred, "there are no Wrongful Acts alleged in the [Amended Complaint]" that were the subject of any notice to Westport during the term of its policy. (Westport Memo at ECF 22). Westport also argues that the Court specifically rejected the Diocese's theory that pre-2002 conduct constituted a continuing violation of the Diocese's rights, and therefore this Court should reject the notion that the Amended Complaint's claims "arise out of" those asserted in the 1996 Action. (*Id*.)

---

[16] The Court notes that Count Six is also based on the implementation of the Places of Worship Law, and incorporates by reference the preceding allegations regarding its enactment. (*See* Am. Compl., ¶ 166–71).

The Court finds that the earlier Order dismissing certain claims from the original complaint does not provide a basis for relieving Westport of its duty to defend the Village.

First, Westport's characterization of the Order on the Village's Motion to Dismiss ignores the fact that Judge Hurley specifically allowed the Diocese's allegations as to the Places of Worship Law to remain in the Amended Complaint. While the Court did reject the Diocese's theory of a continuing violation as to certain pre-2002 conduct, it explicitly determined that the Diocese's claims as to the Places of Worship Law constituted a continuing violation of the Diocese's rights; thus, these claims were *not* time-barred. Second, Westport's argument also ignores the fact that the standard for establishing a continuing violation for purposes of the statute of limitations is different from the standard for establishing a duty to defend. Finding a duty to defend is a matter of contract interpretation, while finding a continuing violation requires the Court to inquire into the accrual date of certain claims.[17]

Having applied the Westport Policy terms as written, *see Village of Sylvan Beach v. Travelers Indus. Co.*, 55 F.3d 114, 115 (2d Cir. 1995), Westport cannot show that there is "no possible factual or legal basis" on which its duty to defend could attach. *See Century 21*, 442 F.3d at 83. The Court thus finds that Westport has a duty to defend the Village in the 2009 Action. Westport's motion for summary judgment is denied and the Village's motion for summary judgment is granted as to Westport.

---

[17]     The inquiry into whether an alleged violation of one's rights is "ongoing" or "continuing" differs as to whether it may be said to be causally related to earlier conduct. As noted above, the Court determines whether the Diocese's claims in the 2009 Action "arise out of" allegations in the 1996 Action by comparing the two complains and seeing whether a causal connection exists. In examining whether the Diocese had suffered a "continuing violation" of its rights, Judge Hurley inquired as to when the Diocese knew or had reason to know of its claims at the beginning of the 1996 Action and at its conclusion.

### D. St. Paul Has a Duty To Defend The Village

The Village argues that St. Paul has a duty to defend the Village in the 2009 Action because the Amended Complaint alleges that that Building Superintendent Michael Malatino conducted "one or more warrantless searches of the Diocese's Property." (Am. Compl., ¶ 100). Because the Amended Complaint alleges that Malatino "holds himself out as having police power within the Village to issue summonses, citations, or other official process," (*id*.), the Village argues that the Amended Complaint alleges a wrongful act "committed while conducting law enforcement activities or operations" within the meaning of the St. Paul Policy.

St. Paul, however, argues that Malatino's alleged actions do not fall within the policy's definition of "law enforcement activities or operations," which are defined as "any of the official activities of your police department, sheriff agency, *or other public safety organization which enforces the law and protects persons or property*." (Dkt. 61–1, St. Paul Policy at ECF 263) (emphasis added). St. Paul argues that its Policy does not contemplate the Buildings Department as a "public safety organization" and cites to extrinsic evidence that purports to demonstrate the parties' intent to limit the "public safety organizations" to those akin to police departments and sheriffs.[18]

As this Court has already noted, "it is well established that an insurer's duty to defend is much broader than the duty to indemnify and will arise 'whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy.'" *Durant v. N. Country Adirondack Co-op. Ins. Co.*, 807 N.Y.S.2d 427, 429 (N.Y. App. Div. 2005) (citing *Fitzpatrick v. Am. Honda Motor Co., Inc.*, 78 N.Y.2d 61, 65 (N.Y. 1991)). Indeed, "even where there exist extrinsic facts suggesting that the claim may ultimately prove meritless or

---

[18]    St. Paul includes the Village's applications for law enforcement liability coverage, which indicate the scope of coverage sought.

outside the policy's coverage, the insurer cannot avoid" its duty to defend. *Fitzpatrick*, 78 N.Y.2d at 66.[19] Thus, if the Court compares the allegations in the Amended Complaint to St. Paul's Policy and finds that the allegations arguably fall within the relevant provisions, St. Paul must defend the suit, even if a question remains as to its ultimate duty to indemnify. *See CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 751 F. Supp. 2d 444, 450 (E.D.N.Y. 2010), *aff'd*, 720 F.3d 71 (2d Cir. 2013) (finding that even where there is a question as to whether a claim falls within the insurer's duty to indemnify, the insurer must still defend, "leaving the issue of indemnification to be settled after establishment of the insured's liability.") (citing *Village of Sylvan Beach*, 55 F.3d at 115; *Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F. Supp. 1213, 1220 (S.D.N.Y. 1986) ("To the extent there is an ambiguity in the relevant policy provisions, the ambiguity, at least for the purposes of the obligation to defend, must be resolved against the insurer.").

Upon comparing the allegations of the Amended Complaint to St. Paul's Policy, the Court finds that the allegations as to Malatino fall within the scope of coverage. The Amended Complaint clearly alleges that Malatino "holds himself out as having police power within the Village to issue summonses, citations, or other official process," (Am. Compl., ¶ 100). Construing this allegation liberally, as the Court must when determining an insurer's duty to defend, the Court finds that it alleges that Malatino had authority to engage in "law enforcement operations and activities," because it alleges that Malatino could "enforce the law and protect persons and property. (*See* Dkt. 61–1, St. Paul Policy at 262-63). The Amended Complaint goes on to allege that Malatino "conducted one or more warrantless searches of the Diocese's

---

[19]       In *International Business Machines Corp. v. Liberty Mut. Fire Ins. Co.*, the Second Circuit noted that that it was unclear whether New York courts allow insurers to use extrinsic evidence to escape the duty to defend. *See* 303 F.3d 419, 426–27 (2d. Cir. 2002).

Property," (Am. Compl., ¶ 100), thereby alleging that Malatino's actions caused an injury to the Diocese in the form of the "invasion of the right of private occupancy of . . . premises that a person occupies" or a "violation of civil rights protected under any federal, state or local law." (*See* Dkt. 61–1, St. Paul Policy at 262-63) (defining "injury or damage"). The Amended Complaint thus alleges a "covered injury . . . that is caused by a wrongful act that is committed while conducting law enforcement activities or operations," for which St. Paul has the duty to defend. (*Id*. at 262-63 (defining scope of coverage and duty to defend for "injury or damage covered by this agreement).[20]

St. Paul advances additional objections to its duty to defend, but the Court finds each of these unavailing. First, St. Paul argues that the allegations as to Malatino should not be found to establish St. Paul's duty to defend because "an insured may not, by use of a shot-gun allegation, create a duty to defend beyond that which was anticipated by the parties when they entered into the contract." *See Nancie D. v. New York Cen. Mut. Fire Ins. Co.,* 195 A.D.2d 535, 536-37 (N.Y. App. Div. 1993) (citing cases). Here, the Court finds that the allegations as to Malatino are sufficiently well-plead so as not to constitute a "shotgun allegation."[21] Malatino is a named Defendant, and the Diocese alleged that Malatino's alleged conduct was part of the Village's campaign to block the development of Queen of Peace. Given the long history of the dispute between the Diocese and the Village, it is not implausible that the Village's officials and

---

[20]     Even if a question remains as to whether Malatino's alleged actions constituted "law enforcement activities or operations" as defined by the St. Paul Policy, any ambiguity must be construed against the insurer and in favor of the insured (with respect to a duty to defend). *See Burroughs Wellcome Co.*, 632 F. Supp. at 1220 ("To the extent there is an ambiguity in the relevant policy provisions, the ambiguity, at least for the purposes of the obligation to defend, must be resolved against the insurer.").

[21]     The cases cited by St. Paul do not supply a definition of the term "shotgun allegation." The Court takes it to mean a far-fetched or patently implausible allegation.

employees would be alleged to have played a role in carrying out the Village's alleged discriminatory and harassing campaign.

Second, St. Paul argues that the Amended Complaint does not allege that Malatino's conduct was "official," as is required by the St. Paul Policy. (*See* Dkt. 61–1, St. Paul Policy at ECF 263). But the Amended Complaint alleges that the Village *deputized* Malatino to harass the Diocese by taking actions pursuant to his authority. (*See* Am. Compl., ¶ 100).[22] By alleging that Malatino acted at the Village's direction to conduct warrantless searches of the Village's property, the Amended Complaint plainly alleges that Malatino acted in an official capacity.[23]

Third, St. Paul asserts that the Village should be equitably estopped from requiring St. Paul to defend it in the 2009 Action.[24] Based on the Village's failure to identify its Building Department as a law enforcement agency in its applications for coverage, St. Paul argues that the Village should be estopped from seeking defense coverage of the 2009 Action. (*See* St. Paul

---

[22]     "The Defendants – upon information and belief – through Malatino, who holds himself out as having police power within the Village to issue summonses, citations, or other official process, beginning in or about April, 2009 conducted one or more warrantless searches of the Diocese's Property. Malatino and the Defendants identified in this subparagraph did so, upon information and belief, to harass the Dioceses in retaliation." (Am. Compl., ¶ 100).

[23]     The fact that the Amended Complaint could be construed as asserting that Malatino acted without authority does not defeat St. Paul's duty to defend. "Where there are plausible, yet varying, constructions given to a policy which arise from ambiguities therein, it cannot be said as a matter of law that there is no factual or legal basis upon which an insurer might eventually be held liable to indemnify under the policy." *Burroughs Wellcome Co.*, 632 F. Supp. at 1220 (finding insurer had duty to defend).

[24]     It is not actually clear to the Court whether St. Paul invokes the equitable estoppel doctrine to avoid its duty to defend or to indemnify, as its motion papers refer to both duties. (*See* St. Paul Memo at ECF 36 (arguing the Village should be "estopped from seeking [law enforcement liability] coverage"); *id*. at ECF 37 ("The Village should be estopped from now claiming that the [St. Paul Policy] affords a defense to it"). The Court construes St. Paul's argument as pertaining to its duty to defend, given that it is premature to determine indemnification as to the 2009 Action at this juncture. *See CGS Indus., Inc.*, 751 F. Supp. 2d at 450 (deferring the issue of indemnification until after establishment of the insured's liability).

Memo at ECF 36–38).  While St. Paul's equitable estoppel argument is creative, it cannot succeed.  For one thing, St. Paul has not shown that equitable estoppel is appropriate for an *insurer* to wield against its insured, rather than the other way around, which is the norm.  *See, e.g.*, *James River Ins. Co. v. Power Mgmt., Inc.*, No. 12–CV–02706, 2014 WL 5460548, at \*7 (E.D.N.Y. Oct. 28, 2014) (insured asserted doctrine of equitable estoppel against insurer).  Nor does St. Paul address how the doctrine of equitable estoppel, when invoked by an insurer, can be reconciled with New York's longstanding policy recognizing a broad and robust duty to defend on the part of insurers.  Allowing an insurer to estop its insured from seeking defense coverage based on the *insured*'s failure to anticipate future events, such as particular employees of the insured being sued, would eviscerate the duty to defend.

More importantly, St. Paul has made no attempt to establish the elements necessary for equitable estoppel; indeed, it does not even recount the four elements in its briefing papers. "Under New York law, equitable estoppel requires a showing of: (1) An act constituting a concealment of facts or a false misrepresentation; (2) An intention or expectation that such acts will be relied upon; (3) Actual or constructive knowledge of the true facts by the wrongdoers; (4) Reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment."  *Schneider v. Canal Ins. Co.,* No. 98–CV–5368, 1999 WL 689476, at \*13 (E.D.N.Y. Sept. 1, 1999), *aff'd,* 210 F.3d 355 (2d Cir. 2000).  St. Paul merely relies on the Village's applications for coverage, arguing that the Village knew that it was not purchasing law enforcement liability coverage for officials employed in its Building Department.  However, this bald assertion—even assuming its truth—does not establish that St. Paul will suffer "substantial detriment" in defending the Village in the 2009 Action.  *Cf. James River Ins. Co. v. Power*

*Mgmt., Inc.*, No. 12–CV–02706, 2014 WL 5460548, at *8 (stating that detrimental reliance is "generally a question of fact").

The Court thus finds that St. Paul cannot avoid its duty to defend. The Court denies St. Paul's motion for summary judgment and grants the Village's motion as to St. Paul.

## III.   CONCLUSION

For the reasons stated above, the Court declares that Darwin does not have a duty to defend the Village in the 2009 Action but that Westport and St. Paul both do. The Court thus grants Darwin's Motion for Summary Judgment as to Westport and the Village, denies Westport's Motion for Summary Judgment, denies in part and grants in part the Village's Motion for Summary Judgment against Darwin and Westport, grants the Village's Motion for Summary Judgment against St. Paul, and denies St. Paul's Motion for Summary Judgment.


SO ORDERED:


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2015
          Brooklyn, New York